UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ANGEL R. SPARROW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:07-CV-506 TLS-CAN |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

On October 19, 2007, Plaintiff Angel R. Sparrow (Sparrow) filed her complaint in this Court. On February 14, 2008, Sparrow filed an opening brief asking this Court to reverse the decision of the Commissioner of Social Security. After two extensions of time, Defendant Social Security Administration (SSA) filed its response brief on May 30, 2008. On June 13, 2008, Sparrow filed her reply brief. This Court now enters its ruling based upon the record of this case that includes the pleadings, the motions, the administrative record and the briefs of the parties.

**I.    PROCEDURAL BACKGROUND**

On June 2, 2003, Sparrow filed an application for disability insurance benefits with the SSA (Tr. 22). Her claim was rejected initially on September 10, 2003, and upon reconsideration on November 17, 2003 (Tr. 22). On December 4, 2003, Sparrow filed a timely request for a hearing (Id.). A hearing was held on June 2, 2005, in front of an Administrative Law Judge (ALJ) in Fort Wayne, Indiana (Id.). A vocational expert (VE) testified at the hearing (Tr. 305-8). In a decision dated September 8, 2006, the ALJ denied Sparrow's application and found her not disabled (Tr. 22-32).

Sparrow filed a request for review of the hearing decision. The Appeals Council denied

Sparrow's request on August 17, 2007, and upon reconsideration on November 8, 2007, making the ALJ's decision the final decision of the Commissioner (Tr. 8-10, 4-6).  Sparrow filed a timely complaint for judicial review on October 19, 2007.  The SSA filed an answer to Sparrow's complaint on December 31, 2007.   Sparrow filed a memorandum in support on February 14, 2008.  After two extensions of time, the SSA filed a memorandum in support of the Commissioner's decision on May 30, 2008.  On June 13, 2008, Sparrow filed a reply to the SSA's memorandum in support of the Commissioner's decision.  This Court may enter a ruling in this matter based on the parties' consent, 28 U.S.C. § 636(c), and 42 U.S.C. § 405(g).

**II.    ANALYSIS**

    A.    Facts

        1.    Background

Sparrow was born on July 11, 1975, and was 29 years old at the time of the hearing  (Tr. 88, 289 ).  She is married, stands 5' 8" and weighs approximately 264 pounds (Tr. 294, 78, 295).  Sparrow completed her education through the eleventh grade, and on a typical day she wakes up at about 8 a.m., eats breakfast, walks around the house for a while, does a dish or two, and lies down on her side about every half hour (Tr. 85, 304).  Her past relevant work includes working as a supervisor, a shear operator and on a wire harness (Tr. 80).

        2.    Medical Evidence

            a.    Dr. Isa Canavati (Dr. Canavati)

Sparrow first saw Dr. Canavati for a neurosurgical evaluation on January 30, 2002 (Tr. 159).  She was complaining of lower back discomfort, most noticeable upon standing or walking (Id.).  Dr. Canavati ordered an MRI, which showed advanced degenerative disc disease and central disc herniation (Tr. 160).  He recommended surgery as a last resort, referred her to a colleague for

2

possible physical therapy and steroid injection, and stressed the importance of a weight reduction diet (Id.).

Sparrow saw Dr. Canavati again on May 20, 2002 (Tr. 147). Dr. Canavati told Sparrow she may want to consider lumbar decompression and instrumented fusion because she did not show any improvement despite extensive physical therapy and three steroid injections (Id.). Sparrow elected to undergo the surgery, which took place on June 26, 2002 (Tr.144-45).

Dr. Canavati performed a post-surgery evaluation of Sparrow on July 23, 2002 (Tr. 134). Sparrow reported a reduction in her back and leg pain and related symptoms, and Dr. Canavati restricted her from lifting more than thirty pounds for a three month period (Id.). Dr. Canavati saw Sparrow again on September 24, 2002, and noted that her condition had continued to improve (Tr. 131). Sparrow complained only of mild residual lower back pain and stiffness (Id.). Dr. Canavati released her to return to her work at a day care, but he extended the thirty-pound lifting restriction for an additional six weeks (Id.).

Sparrow last saw Dr. Canavati on January 27, 2003, and she continued to complain of low back pain and comfort particularly noticeable upon prolonged sitting or driving (Tr. 128). Dr. Canavati repeated his recommendations that she start a weight reduction program. (Id.). Sparrow stated that she was considering surgical intervention for weight reduction, and Dr. Canavati agreed that it would be medically appropriate (Id.).

b.   Dr. Donald Ebersole (Dr. Ebersole)

Sparrow visited Dr. Ebersole on December 6, 2002, for treatment of a headache and chronic depression (Tr. 168). Sparrow complained of crying spells, breast soreness, and left lower abdominal pain (Id.). Dr. Ebersole noted pelvic adhesions and that Sparrow had lost one pound in the last month by utilizing the Weight Watchers diet (Id). Dr. Ebersole prescribed Xenical and

Effexor (Id.).

Dr. Ebersole saw Sparrow for a follow-up on January 10, 2003, and he noted that Sparrow's headaches had improved, but she had quit doing her treadmill workouts due to back pain (Id.). Dr. Ebersole suggested that Sparrow maintain a high-fiber diet and replace her high carbohydrate intake with more fruits and vegetables (Id.). Dr. Ebersole also noted that Xenical was ineffective, so he continued only Sparrow's Effexor prescription (Id.).

Sparrow visited Dr. Ebersole on June 20, 2003, and she told him she had been fired from her job because of back pain (Id.). Sparrow also reported that she had been trying to do yard work to keep active, but that her back pain made her want to stay in bed all day and cry (Id.). She also said she experienced pain underneath her right arm while applying deodorant, which Dr. Ebersole opined was an extension of the pectoralis region from working in the yard (Id.). Dr. Ebersole increased Sparrow's dosage of Effexor (Id.).

In a report filed on July 7, 2003, Dr. Ebersole found that plaintiff had limited extension to 10 degrees of the lumbar spine and limited flexion to 80 degrees (Tr. 165). He also noted that prolonged walking or standing elicited Sparrow's pain and that she needed to change positions after an hour of standing or sitting (Tr. 166).

On April 15, 2005, Dr. Ebersole diagnosed Sparrow with carpal tunnel syndrome and stated that he injected both of her wrists with only a temporary benefit (Tr. 240). He noted that Sparrow also had chronic lower back pain and was taking Oxycontin regularly as well as some antidepressant medications (Id.). On May 31, 2005, Dr. Ebersole prepared a report in which he opined that Sparrow was unable to sit or stand for more than fifteen minutes at a time because of severe back pain with radiation of pain and numbness to legs and hips (Tr. 236). He also opined that Sparrow's symptoms were severe enough to constantly interfere with her attention and

4

concentration, that she would need to take a ten minute break every fifteen minutes while at work, and that she would need to lie down at unpredictable times during the work day, as often as every hour for thirty minutes at a time (Tr.236-38).

          c.         <u>Nurse Jeffrey Kauffman (Mr. Kauffman)</u>

Sparrow underwent treatment for various psychiatric impairments at the Oakland Psychiatric Center (Center) spanning from September 15, 2003, until April 22, 2005 (Tr. 216-22, 225-36). The records from the Center show a consistent diagnosis of depression, and various treaters observed that Sparrow was tearful during the evaluations (Tr. 216-18, 220-21, 226). On April 25, 2005, Mr. Kauffman completed a form evaluating Sparrow's ability to do work-related activities and noted that Sparrow had moderate difficulty responding appropriately to work pressures in a usual setting and had marked difficulty responding appropriately to changes in a routine work setting (Tr. 232-33). Mr. Kauffman also noted that Sparrow's physical mobility was impaired by her leg and back pain and that Sparrow's pain and depression impaired her concentration (Tr. 233).

          d.         <u>Dr. Craig Nordstrom (Dr. Nordstrom) and Dr. L. Bastnagel (Dr. Bastnagel)</u>

The SSA sent Sparrow to Dr. Nordstrom for a psychological evaluation on August 18, 2003 (Tr. 171-74). Dr. Nordstrom diagnosed Sparrow with adjustment disorder with mixed anxiety and depressed mood (Tr. 174). On memory testing, Sparrow could recall three items immediately, but remembered only one when asked five minutes later (Tr. 172). She also made numerous errors on basic mathematical calculations and could not perform serial sevens (<u>Id.</u>). Nordstrom noted that she wept often during the interview and moved in her chair as "one experiencing much pain" (Tr. 173).

On November 13, 2003, Dr. Bastnagel filled out a physical RFC assessment in which he opined that Sparrow could sit or stand for six hours in an eight-hour day and could lift 20 pounds

5

occasionally and 10 pounds frequently (Tr. 176).

        3.    Sparrow's Testimony

At an oral hearing held June 2, 2005, Sparrow testified that the pain in her lower back had worsened after her surgery and that she usually lied on her left side to relieve the pain (Tr. 297). Sparrow said she cried when experiencing severe pain because there was nothing she could do for it, but that the OxyContin made the pain tolerable (Tr. 299). In addition to back pain, Sparrow claimed she had trouble buttoning her clothes because of pain in her wrists and would periodically experience headaches (Tr. 300). Furthermore, she said that she was experiencing depression and cried because she couldn't do all the things she could do in the past, and that she has had thoughts of suicide and trouble concentrating  (Tr. 301).

Sparrow said she was able to sit for about fifteen minutes at a time and could stand for ten to fifteen minutes (Tr. 303). She also testified that she could walk twenty-five to fifty yards at a time, occasionally lift a gallon of milk, and spends three or four hours out of an eight hour day lying on her side (Tr. 303-4). Sparrow said she used to do activities such as swimming, camping, volleyball and shopping with friends (Tr. 304-5). She claimed that the cold water in the pool now stiffened her back (Tr. 305).

  B.    Standard of Review

The standard of review for an ALJ's decision is whether it is supported by substantial evidence and free of legal error. See 42 U.S.C § 405(g); Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005); Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005); Golembiewski v. Barnhart, 322 F.3d 912, 915 (7th Cir. 2003). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept to support such a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1972). The  reviewing court must not re-evaluate the facts, re-weigh the

6

evidence or substitute its own judgment for that of the ALJ. Griffith v. Callahan, 138 F.3d 1150, 1152 (7th Cir. 1998). However, the ALJ must build a logical bridge from the evidence to his conclusion. Haynes, 416 F.3d at 626. Because the ALJ is in the best position to observe the demeanor of witnesses, the reviewing court will not disturb the ALJ's credibility determinations so long as they find some support in the record and are not "patently wrong." Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). However, an ALJ's legal conclusions are reviewed *de novo*. Haynes, 416 F.3d at 626.

      C.      Sparrow's Motion for Reversal of the Commissioner's Decision

The Social Security Act provides for the payment of SSI benefits to disabled individuals whose income falls below stated levels. See 42 U.S.C. § 1381(a). The Act defines disabled as:

> unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c (a)(3)(A). The Act further states that a person is under a disability:

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c (a)(3)(A). Social Security regulations establish a sequential five-part test to determine whether a claimant is disabled. The ALJ must consider whether (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so

severe as to prevent substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.  20 C.F.R §§ 404.1520(a)(4)(I)-(v), 416.920; Briscoe, 425 F.3d at 352.  Should  the ALJ find that the claimant is disabled or not disabled at any step, he may make his determination without evaluating the remaining steps.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer at either step three or step five will result in a finding of a disability.  Briscoe, 425 F.3d at 352.  At step three, if the impairment meets any of the severe impairments listed in the regulations, the impairment is acknowledged by the Commissioner.  See 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. app. 1, subpart P, § 404.  However, if the impairment is not so listed, the ALJ assesses the claimant's residual functional capacity (RFC), which in turn is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society under step five.  20 C.F.R. § 404.1520(e).  The claimant bears the burden of proof on steps one through four, but the burden shifts to the Commissioner at step five.  Id.

At step five, the ALJ found that there were a significant number of jobs in the national economy that a person of Sparrow's age, education, work experience and FRC could perform.  As a result, Sparrow was not disabled.  Sparrow asserts several arguments attacking the ALJ's assessment of her case.  First, Sparrow contends that the ALJ failed to allocate proper weight to Dr. Ebersole's, Dr. Nordstrom's and Kauffman's opinions Second, Sparrow asserts that the ALJ failed to consider the combined effect of Sparrow's obesity and physical limitations.  Finally, Sparrow contends that there are not a significant number of jobs available to her and that the ALJ should have discussed the nationwide availability.

8

1.      The ALJ's credibility evaluation of Sparrow's physicians is not supported by substantial evidence

A physician is not a treating physician unless he or she has an ongoing relationship with the claimant.  White v. Barnhart, 415 F.3d 654, 658 (7th Cir. 2005).  An ongoing relationship is one in which "the medical evidence establishes that you see or have seen the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for . . . medical condition(s)."  20. C.F.R. § 404.1502.  More weight is generally given to the opinion of a treating physician because he is more familiar with the claimant's conditions and circumstances.  20 C.F.R. § 404.1527(d)(2);  Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000).  An ALJ is entitled to reject a non-treating physician's opinions in favor of other physicians' opinions and evidence in the record.  Haynes, 416 F.3d at 631.

An ALJ is to give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record.  Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  However, medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence in the record.  Clifford, 227 F.3d at 870.  When evidence in opposition to the presumption is introduced, the rule drops out and the treating physician's evidence is just one more piece of evidence for the ALJ to weigh.  Hofslien, 439 F.3d.at 377 (citations omitted).  Unfortunately, there is no bright line for when a physician's opinion is inconsistent with other substantial evidence in the record, and it is essentially a case by case determination depending on the circumstances.  Id.  Sparrow argues that the ALJ failed to give proper weight to the findings of three of her physicians.

9

        a.      Dr. Ebersole

Sparrow argues that the ALJ erred in his evaluation of her RFC when the ALJ failed to give Dr. Ebersole controlling weight, specifically Dr. Ebersole's finding that Sparrow could not sit or stand for more than fifteen minutes at a time.

In his ruling, the ALJ wrote:

> Dr. Ebersole stated in July 2003 that the claimant could not sit or stand for more than one hour at a time and needed to change positions often.  However, in May 2005 right about the time of the second surgery, Dr. Ebersole stated that the claimant could not sit or stand more than fifteen minutes at a time and walking was limited completely by back pain.  Dr. Ebersole said that the claimant could never perform any postural movements, and could occasionally reach, handle, and finger due to numbness in the hands from lower arm neuropathies.  The claimant had to lie down every hour and would miss three or more days of work.  While this may have been true when immediately before and after the back surgeries, the rest of the evidence supports a finding that the claimant could do the things stated in her residual functional capacity once she recovered from the surgery itself.  State Agency physicians concluded in 2003 that the claimant could perform a limited range of light exertion, which was consistent with Dr. Canavati's restrictions at that time.  However, the more recent evidence establishes that the claimant had more limitations than that secondary to her pain, which led her to have the second surgery.

(Tr. 29).

The ALJ essentially found that Dr. Ebersole's opinion was not consistent with other evidence in the record.  Specifically, the ALJ concluded that State Agency physicians and Dr. Canavati's findings were contrary to Dr. Ebersole's opinion.  Unfortunately, the ALJ's explanation of why this evidence is inconsistent with Dr. Ebersole is either insufficient or unreasonable.

First, the ALJ indicates that "other State Agency physicians" found that Sparrow could do

light work.[1]  However, the ALJ did not indicate to which state agency physicians he was referencing.  So, this Court can only speculate as to which physicians are not consistent with Dr. Ebersole.  This Court is not saying the ALJ's reliance upon the state agency physicians is incorrect.  In fact, the ALJ may have been properly referring to other physicians in the record, but if such is the case, the Court cannot identify them. This Court is not the finder of fact, nor is it this Court's duty to scour the record to verify the ALJ's findings.  But, upon examination of the record, this Court finds that only *one* state agency physician, Dr. Bastnagel, found that Sparrow could sit or stand for six hours in an eight-hour day and could lift 20 pounds occasionally and 10 pounds frequently, which is not consistent with Dr. Ebersole's opinion that Sparrow is unable to sit or stand for more than fifteen minutes at a time because of severe back pain with radiation of pain and numbness to legs and hips (Tr. 176, 236). A contrary opinion from one nontreating physician, by itself, is an insufficient basis to deny a treating physician controlling weight.  Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).  This Court must be able to identify the beginning of the ALJ's analytical bridge to evaluate it.  As the ALJ's opinion stands, the Court cannot.  If there are other physicians' opinions that are not consistent with Dr. Ebersole's findings in the record, then the ALJ must specifically identify these physicians and their findings upon remand.  Simply stated, without more specificity as to which records or which doctors are not consistent with Dr. Ebersole's findings, this

---

[1] Light work is defined by 20 C.F.R. § 416.967 (b):

 Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

11

Court cannot say the ALJ's findings are supported by substantial evidence.

However, despite the ALJ's errors regarding the state agency physicians, his opinion would not require remand if the ALJ had properly identified Dr. Canavati's records as inconsistent with Dr. Ebersole's opinion.  This evidence by itself could be sufficient to discount Dr. Ebersole's opinion as controlling, except for one problem: the ALJ's characterization of Dr. Canavati's findings appears to be a misconstruction of the record, which means that his explanation of why Dr. Canavati is not consistent with Dr. Ebersole is not supported by substantial evidence.

The ALJ concluded that Dr. Canavati's findings were not consistent with Dr. Ebersole's findings "at that time" (Tr. 29).  "At that time" can only mean contemporaneous with the time period stated by the ALJ, which was 2003.  According to the record, Sparrow last saw Dr. Canavati on January 27, 2003, when she complained of low back pain, aggravated by prolonged siting and driving (Tr. 128).  At that time, Dr. Canavati recommended that she start a weight reduction plan (Id.).  He mentioned nothing about limitations in sitting, standing or walking.  In fact, the most recent record where Dr. Canavati discusses any limitations of Sparrow comes from September 24, 2002.  On the other hand, Sparrow's first visit to Dr. Ebersole was on December 6, 2002, and he did not make the finding that she needed to alternate between sitting and standing every hour until July 7, 2003, almost six months after Dr. Canavati's last visit with Sparrow and a full year after Dr. Canavati commented on Sparrow's limitations or lack thereof.  Furthermore, Dr. Ebersole's finding that Sparrow needed to alternate between sitting and standing every fifteen minutes was not made until May 31, 2005. Based on this evidence, this Court cannot follow the ALJ's reasoning that Dr. Ebersole's opinion was somehow not consistent with Dr. Canavati's opinion.  Sparrow was not being treated by Dr. Canavati nor was she assessed by a state agency physician contemporaneously, or as phrased by the ALJ, "at that time."  Therefore, this Court finds that the ALJ's line of reasoning

in discounting Dr. Ebersole's opinion given in 2005 by using Dr. Canavati's opinion from over two years prior is unreasonable.  It is possible that the ALJ simply gave more weight to Dr. Canavati's opinions, and the language "at that time" was either misplaced or misused.  However, the language is what it is, and while this court cannot re-evaluate facts, it cannot accept an unreasonable conclusion.  Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).  Regardless, this matter must be remanded.  On remand, the ALJ must expand upon his analysis to clarify how and why Dr. Canavati's opinions were inconsistent with Dr. Ebersole's.

Finally, the ALJ used vague language that suggests he failed to give controlling weight to a treating physician.[2]  The ALJ indicated:

> the rest of the evidence supports a finding that the claimant could do the things stated in her residual functional capacity once she recovered from the surgery itself.  State Agency physicians concluded in 2003 that the claimant could perform a limited range of light exertion...However, the more recent evidence establishes that the claimant had more limitations than that secondary to her pain, which led her to have the second surgery.

(Tr. 29).  The phrase "more recent evidence" is vague.  More troubling, however, is that the ALJ concludes that this phrase establishes the Sparrow had "more limitations than that secondary to her pain."  Without mentioning the specific medical evidence supporting these statements, the ALJ crosses into the dangerous territory of playing doctor.  The medical opinions of treating physicians are entitled to controlling weight absent a sufficient justification from the ALJ to discount their opinions.  See Clifford, 227. F.3d at 870.  When an ALJ fails to articulate sufficient justification for denying controlling weight to a treating physician a remand is warranted.  Id.  Upon remand the ALJ

---

[2] This Court finds that Dr. Ebersole is a treating physician because he examined Sparrow on several occasions between 2002 and 2005, thus establishing an ongoing relationship with her as required by regulation. See Tr. 165-86, 240-53. See also 20 C.F.R. § 404.1502.

13

must clearly explain what evidence leads to his conclusion and why.

In summary, the ALJ failed to adequately identify specific evidence, reached unsupported conclusions, and failed to give controlling weight to a treating physician's opinion. Therefore, the ALJ's opinion is not supported by substantial evidence, and this case must be remanded.

### b. Dr. Nordstrom

Sparrow also contends that the ALJ did not give adequate weight to Dr. Nordstrom's opinion when determining Sparrow's RFC. This Court finds this argument unpersuasive. The record shows that Dr. Nordstrom was appointed by the SSA to perform a psychological evaluation of Sparrow and only met with Sparrow on one occasion. Therefore, Dr. Nordstrom did not establish an ongoing relationship with Sparrow such that he could be considered a treating physician as defined by regulation (Tr. 171-74). See 20. C.F.R. § 404.1502. Consequently, the ALJ was entitled to reject Dr. Nordstrom's opinion in favor of other medical opinions and evidence in the record.

### c. Mr. Kauffman

Sparrow argues that the ALJ erred when he failed to determine what weight to give to Mr. Kauffman's opinion. This Court finds no error. The ALJ did not accord Mr. Kauffman controlling weight, stating that Mr. Kauffman was "not an acceptable medical source as defined in the regulations as he is not a licensed psychologist or psychiatrist" (Tr. 30-31). Sparrow supports her argument with SSR06-3p, which states that "opinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects." The ruling says nothing about assigning controlling weight to such sources. More importantly, the 7th Circuit has held that although an ALJ cannot ignore an entire line of evidence, he is not required to evaluate

14

every piece of testimony and evidence submitted.  Carlson v. Shalala, 999 F.2d 180, 181 (7th Cir. 1993).  This Court is bound by the holdings of the 7th Circuit.  Carlson does not require the ALJ to provide an in depth discussion of the weight he chose to give Mr. Kauffman's opinion, but instead requires only that the ALJ not ignore the entire line of evidence.  It is clear from the ALJ's opinion that he did not ignore this evidence as he specifically mentioned Mr. Kauffman's findings and that he would not afford Mr. Kauffman controlling weight.  Therefore, this Court finds the ALJ's credibility determination of  Mr. Kauffman in accord with Carlson and without error.[3]

In summary, this Court finds that the ALJ erred in the assessment of Sparrow's RFC when he improperly discounted Dr. Ebersole's opinion without providing evidentiary support that Dr. Ebersole's opinion was inconsistent with other medical findings.  An ALJ must provide a logical bridge from the evidence to his conclusion, and the ALJ's decision cannot stand if it lacks evidentiary support.  Therefore, the case is remanded on these grounds.  However, this Court finds that the ALJ properly assessed the credibility of Dr. Nordstrom and Mr. Kauffman.

### III.   CONCLUSION

This Court finds that the ALJ's credibility assessment of treating physician Dr. Ebersole was improper because the ALJ failed to articulate how Dr. Ebersole's opinions were internally inconsistent or inconsistent with the evidence of record.  Therefore, this Court **GRANTS** Sparrow's request [Doc. No. 12 ] to **REVERSE** the ALJ's decision and **REMANDS** this case to the Commissioner .  The clerk is instructed to term the case.

---

[3] Sparrow also argues that the ALJ failed to render a proper physical RFC because he did not include Dr. Ebersole's findings about the frequency with which Sparrow needed to alternate between sitting and standing, that the ALJ failed to consider the combination of Sparrow's impairments, and that the number of jobs available to Sparrow was not significant.  This Court cannot address these issues in light of its finding that ALJ's credibility assessment of Dr. Ebersole was inadequate.

**SO ORDERED.**
Dated this 31st Day of July, 2008.

                                            S/Christopher A. Nuechterlein
                                            Christopher A. Nuechterlein
                                            United States Magistrate Judge